## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

RD LEGAL FUNDING PARTNERS, LP,

        Plaintiff,

vs.

MEL POWELL, ESQ.; POWELL LAW
FIRM, LLC; JEFFREY C. BOGERT, ESQ.;
LAW OFFICE OF JEFFREY C. BOGERT,
ESQ.,

        Defendants.

Civil Action No. _14 - 7983 (FSH)_

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## APPLICATION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..............................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................................1

STATEMENT OF FACTS..................................................................................................................2

    A. Defendants and Osborn Collectively Pursue Mass Tort Claims…….………………....2

    B. Defendants and Osborn Obtain Funding from Plaintiff…………….…..…………….....5

        1. Funding During the B&O Phase…………….…..…………………………….......5

        2. Funding During the Osborn Phase…………………………………………….......7

    C. The Subordination Agreements…………...……………………………………………...8

    D. The Powell Defendants Terminate the Osborn/Powell
         Subordination Agreement and Dispute the Monies Owed
         to Plaintiff Thereunder………………………………………………………………….11

    E. Defendants and Osborn Receive Legal Fees from the
         Litigations, but Defendants Fail to Satisfy Their
         Obligations to Establish a Joint Deposit Account,
         Provide an Accounting of the Fees Received, or Make
         Direct Payment to Plaintiff……………………………………………………….…...13

LEGAL ARGUMENT…………………………………………………………………………...15

    A. Standard for Preliminary Injunction……………..……………………………..……15

    B. There Is No Doubt that Plaintiff Is Likely to Succeed on the Merits………………..16

    C. Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief………….………...21

    D. A Balancing of Hardships Militates Heavily in Plaintiff's Favor………...…………22

    E. The Issuance of a Preliminary Injunction Would Serve the Public Interest………....23

CONCLUSION…………………………………………………………………………………..24

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Pages**

*Am. Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*,
  84 F.3d 1471 (3d Cir. 1996) ......................................................................................................22

*Bondi v. Citigroup, Inc.*,
  423 N.J. Super. 377 (App. Div. 2011)........................................................................................ 17

*Callano v. Oakwood Park Homes Corp.*,
  91 N.J. Super. 105 (App. Div. 1966).........................................................................................18

*Corestar Int'l Pte, Ltd. v. LPB Communications*,
  513 F. Supp. 2d 107 (D.N.J. 2007)............................................................................................17

*CPS MedManagement, LLC v. Bergen Reg'l Med. Ctr, L.P.*,
  940 F. Supp. 2d 141 (D.N.J. 2013)............................................................................................ 19

*Deckert v. Independent Shares Corp.*,
  311 U.S. 292 (1940) ...................................................................................................................21

*Emerson Radio Corp. v. Orion Sales, Inc.*,
  80 F. Supp. 2d 307 (D.N.J. 2000)..............................................................................................19

*Goldsmith v. Camden County Surrogate's Office*,
  408 N.J. Super. 376 (App. Div. 2009) .......................................................................................18

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990) ...................................................................................................... 20

*In re Niles*, 176 N.J. 282 (2003) .................................................................................................. 20

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
  882 F.2d 797 (3d Cir. 1989) ......................................................................................................20

*Marsellis-Warner Corp. v. Rabens*,
  51 F. Supp. 2d 508 (D.N.J. 1999)..............................................................................................21

*McAdam v. Dean Witter Reynolds, Inc.*,
  896 F.2d 750 (3d Cir. 1990) ...................................................................................................... 20

*Miller v. Mitchell*,
  598 F.3d 139 (3d Cir. 2010) ......................................................................................................15

*N.J. Coal. of Auto. Retailers v. DaimlerChrysler Motors Corp.*,
   107 F. Supp. 2d 495 (D.N.J. 1999)..................................................................................21

*Red Roof Franchising, Inc. v. AA Hospitality Northshore, LLC.*,
   877 F. Supp. 2d 140 (D.N.J. 2012)..................................................................................16

*Seidenberg v. Summit Bank*,
   348 N.J. Super. 243 (App. Div. 2002).............................................................................. 19

*Stewart v. Beam Global Spirits & Wine, Inc.*,
   877 F. Supp. 2d 192 (D.N.J. 2012)..................................................................................18

*VRG Corp. v. GKN Realty Corp.*,
   135 N.J. 539 (1994) ....................................................................................................... 18

*United Steelworkers of Am., AFL-CIO v. Fort Pitt Steel Casting*,
   598 F.2d 1273 (3d Cir. 1979).........................................................................................21

*Wilson v. Amerada Hess Corp.*,
   168 N.J. 236 (2001) ....................................................................................................... 19

## PRELIMINARY STATEMENT

Before advancing to Defendants and their co-counsel what turned out to be millions of dollars in funding to support their pursuit of high stakes mass tort litigation against pharmaceutical companies, Plaintiff insisted that Defendants execute subordination agreements whereby Defendants (i) subordinated their rights to the legal fees earned from these litigations to Plaintiff's right to first be repaid, and (ii) agreed that, upon receipt, those legal fees would be either paid directly to Plaintiff, or held in trust in a joint deposit account unless and until all of their repayment obligations have been completely satisfied.

Since then, however, Defendants have flatly ignored the very clear terms of the subordination agreements. In fact, Defendant Powell has undertaken specific measures to minimize, and even avoid altogether, his obligations thereunder. First, he redirected cases that were originally referred to his co-counsel so as to remove them from the purview of the agreement, and threatened to sabotage Plaintiff's right of repayment by referring all future cases to other attorneys "so that no one will likely ever see any money on any of these cases." Then, having already conceded that his share of the obligation to Plaintiff was at least $2 million and could exceed $3 million, Defendant Powell announced his intention to seek to invalidate the subordination agreement in its entirety. But perhaps most telling is the fact that, while Defendants have already collectively received more than $200,000 in legal fees and the release of substantially more is imminent, they have neither established the joint deposit account nor made a single payment to Plaintiff.

Given these breaches, Plaintiff's likelihood of success has already been established. Furthermore, the preliminary injunctive relief sought here -- i.e., remittal of the fees already received and the establishment of an account for the preservation of the legal fees received and to

1

be received by Defendants pending the final disposition of this matter -- poses no conceivable harm to Defendant. Rather, it amounts to nothing more than the enforcement of the plain terms to which Defendants voluntarily agreed; it serves the public's interest in the protection of contract rights; and, most importantly, it protects Plaintiff's right of repayment and prevents the irreparable harm that is certain to result if Defendants are permitted to continue withhold and dissipate significant monies for which Plaintiff bargained and to which Plaintiff is now clearly entitled.

## STATEMENT OF FACTS

### A.     Defendants and Osborn Collectively Pursue Mass Tort Claims

The defendants, Mel Powell, Esq./Powell Law Firm, LLC (collectively, the "Powell Defendants") and Jeffrey C. Bogert, Esq./Law Office Jeffrey C. Bogert, Esq. (collectively, the "Bogert Defendants"), are plaintiffs' attorneys who specialize in class action litigation and, more particularly, the prosecution of mass tort claims against pharmaceutical companies. (*See* V. Compl. ("VC"), ¶ 11).

Since 2005, Defendants have worked as co-counsel with Daniel A. Osborn, Esq. ("Osborn"), and his former and current firms (Beatie & Osborn ("B&O") and Osborn Law, LLC (the "Osborn Firm"), respectively), in pursuing personal injury claims involving a class of drugs generically known as bisphosphonates, which were manufactured and sold under the brand names "Aredia" and "Zometa" by Novartis, "Fosamax" by Merck, and "Actonel" by Procter & Gamble/Sanofi-Aventis ("P&G").

These claims were pursued through three separate actions and/or Multi-District Litigations ("MDLs"): (1) the In Re Actonel Products Liability Litigation, which was filed against P&G in United States District Court for the Southern District of New York (the "Actonel

2

Litigation"); (2) the In Re Fosamax Products Liability Litigation, which was filed against Merck in the United State District Court for the Middle District of Tennessee and bears MDL No. 1789 (the "Fosamax Litigation"); and (3) the In Re Aredia/Zometa Products Liability Litigation, which was filed against Novartis in the United States District Court for the Southern District of New York and bears MDL No. 1760 (the "Aredia/Zometa Litigation"). The Actonel Litigation, the Fosamax Litigation, and the Aredia/Zometa Litigation are collectively referred to herein as the "Litigations." (See VC, ¶¶ 12 and 13).

The co-counsel relationship between and among Defendants and Osborn is such that, although all are counsel of record, the Powell Defendants primarily collected and referred cases to the Defendant Bogert and Osborn. Through this arrangement, the Powell Defendants referred hundreds of bisphosphonate cases to the Defendant Bogert and Osborn, of which a small number were filed in the Actonel Litigation, a larger amount were filed in the Fosamax Litigation, and several hundred were filed in the Aredia/Zometa Litigation. (See VC, ¶¶ 14 and 15).

The co-counsel fee arrangement between and among Defendants and Osborn has essentially been the same since 2005, but it underwent some minor, nominal changes in December 2008 when Osborn left B&O to start the Osborn Firm. For the sake of clarity, the co-counsel arrangement shall be divided into two phases. The first phase, which encompasses 2005 through December 2008, shall be referred to as the "B&O Phase." The second phase, which encompasses the departure of Osborn from B&O in December 2008 to the present, shall be referred to as the "Osborn Phase." (See VC, ¶ 16).

The terms and conditions of the co-counsel arrangement during the B&O Phase were governed by two separate agreements: (1) a Fee Agreement between B&O and the Powell Firm, dated December 2005, pursuant to which the legal fees generated by the Litigations were to be

3

distributed sixty percent (60%) to B&O and forty percent (40%) to the Powell Firm, (*see* VC, ¶ 17; Ex. A); and (2) a Fee Agreement between B&O and the Bogert Firm, dated December 21, 2005, pursuant to which the legal fees generated by the Litigations were to be distributed by mutual agreement of the parties, taking into account the relative contributions of each firm. (*See* VC, ¶ 17; Ex. B). These fee agreements shall be collectively referred to as the "B&O Phase Fee Agreements."

When Osborn left B&O to start the Osborn Firm in December 2008, the Powell Firm terminated B&O as co-counsel by letter dated December 11, 2008. Defendants and Osborn then entered into two separate agreements that replaced and, in virtually all material respects, mirrored the arrangement in, the B&O Phase Fee Agreements: (1) the Powell Firm, the Osborn Firm, and Bogert entered a Fee Agreement, dated December 29, 2008 yet effective on January 1, 2009, pursuant to which the legal fees generated by the Litigations were to be distributed sixty percent (60%) to the Osborn Firm and Bogert in the aggregate and forty percent (40%) to the Powell Firm, (*see* VC, ¶ 18; Ex. C); and (2) the Osborn Firm and Bogert entered a Fee Agreement, dated January 24, 2009, pursuant to which their sixty percent (60%) share of the legal fees earned under the global agreement above were split with sixty-five percent (65%) to the Osborn Firm and thirty-five percent (35%) to Bogert. (*See* VC, ¶ 18; Ex. D). These fee agreements shall collectively be referred to as the "Osborn Phase Fee Agreements."

Both the B&O and Osborn Phase Fee Agreements provide that all settlement checks and other payments shall first be made payable to the Powell Defendants and deposited into their trust account, and then the fees due to Defendant Bogert and Osborn shall be forwarded to them. (*See* VC, ¶ 20; Exs. A and C, ¶ 4).

4

## B.     Defendants and Osborn Obtain Funding from Plaintiff

From the outset of the Litigations, Osborn inquired as to whether the Powell Defendants were willing and able to contribute any monies to fund the Litigations, but the Powell Defendants declined to do so. (*See* Declaration of Daniel A. Osborn, Esq. ("Osborn Dec."), ¶ 5). Thus, as the Litigations progressed, Osborn, with Defendants' knowledge, sought funding from Plaintiff to support their substantial litigation costs and expenses. (*See id.* at ¶ 6). While the legal funding arrangements between Plaintiff and its clients involved various, lengthy agreements, the structure of the arrangements was straightforward. That is, Plaintiff advanced monies to its clients in exchange for an assignment and sale of the lawyers' right to legal fees and recovery of the expenses incurred in the underlying litigation. This assignment of fees and expense receivables then served as security for the repayment of the outstanding obligations. (*See* VC, ¶ 23).

### 1.     Funding During the B&O Phase

On or about October 25, 2007, Plaintiff and B&O entered into a Master Assignment and Sale Agreement, pursuant to which Plaintiff agreed to provide funding to B&O on an as needed basis in exchange for B&O's sale and assignment of its right to legal fee receivables, including attorneys' fees and expense reimbursements, arising from the Litigations (the "Legal Fees"). (*See* VC, ¶ 24; Ex. E). The assignment of the Legal Fees secured repayment of the principal amount of the funding plus interest at the lesser of twenty-four percent (24%) per annum or the maximum rate allowable by applicable law. (*See* VC, ¶ 24; Ex. E at ¶1). For the purpose of this brief, the Master Assignment and Sale Agreement shall be referred to as the "B&O Phase Assignment Agreement."

5

. Under the B&O Phase Assignment Agreement, each advance by Plaintiff was considered to be a separate "sale" or transaction, the terms and conditions of which were memorialized in a separately executed schedule (the "Schedule").    The "purchase price" for each sale is the principal amount of funding provided by Plaintiff to B&O. The "fee purchased" is the amount of the Legal Fees being sold and assigned by B&O to Plaintiff.  In other words, the "fee purchased" represents the amount that B&O was obligated to pay to Plaintiff at the expiration of each Schedule. If payment was made by a certain pre-determined date, or before the expiration of the Schedule, the "fee purchased" would be reduced such that the obligations would be lower the sooner they were paid.  The Schedule memorializing each "sale" or transaction sets forth both the "purchase price" and the "fee purchased." (*See* VC, ¶¶ 25 to 26; Ex. E at ¶2).

To secure its obligations under the B&O Phase Assignment Agreement, B&O expressly granted to Plaintiff a security interest in and to the Legal Fees purchased by Plaintiff and in all of B&O's "present and future assets and properties, including without limitation, all accounts, chattel, paper, equipment, instruments, investment property, documents, letter of credit rights, personal property and general intangibles" (collectively, the "Collateral").  (*See* VC, ¶ 28; Ex. E at ¶ 5).  Plaintiff duly perfected its security interest in the Collateral on or about July 13, 2007, by filing with the appropriate filing office a UCC-1 Statement.  (*See* VC, ¶ 29; Ex. F).

Because the bisphosphonate cases were still in their early stages during the B&O Phase, the assignments issued during this period were significantly less than the Osborn Phase. Specifically, there were four outstanding Schedules (A-1 through A-4) entered between the parties reflecting a total original assignment of $1,987,442. (*See* VC, ¶ 30).  From time to time, the assignments set forth in Schedules A-1 through A-4 reached the end of their respective contractual terms without the assigned Legal Fees being paid by B&O, however.  Plaintiff and

6

B&O therefore entered into amendments to these Schedules that affirmed B&O's obligations and extended the due date in exchange for the accrual of interest. As a result of these amendments and the accrual of interest through November 30, 2014, B&O's total obligation under the B&O Phase Assignment Agreement as of that date was approximately $4,877,866. (*See* VC, ¶ 31). This obligation shall hereinafter be referred to as the "B&O Phase Obligation."

## 2.    Funding During the Osborn Phase

In order to properly account for Osborn's transition from the B&O Phase to the Osborn Phase and his retention of roughly ninety-five percent (95%) of the bisphosphonate cases originally referred to B&O, Plaintiff and the Osborn Firm replaced the B&O Phase Assignment Agreement with a new Master Assignment and Sale Agreement, dated January 29, 2009 (the "Osborn Phase Assignment Agreement"). (*See* VC, ¶ 32; Ex. G). The Osborn Phase Assignment Agreement mirrors the material and operative terms of the B&O Phase Assignment Agreement.    It too provides for periodic funding evidenced by Schedules and establishes a security interest in the Legal Fees and the Collateral, which was also perfected by the filing of a UCC-1 Statement. (Ex. G, ¶¶ 1 and 5).

As previously stated, the assignments issued during the Osborn Phase were significantly higher than those issued during the B&O Phase. These assignments were memorialized in Schedules A-1 through A-4, A-6, A-8 through A-13, A-15 through A-33, A-36 through A-51, and originally totaled approximately $16,319,302. (*See* VC, ¶ 33). In addition, in late January through early February 2009, certain obligations totaling less than $500,000 were transferred from the B&O Phase Assignment Agreement to the Osborn Phase Assignment Agreement to account for the transition of the Litigations from B&O to Osborn Law occurring at that time.

7

(*See* VC, ¶34). These transfers occurred before the parties entered into the Subordination Agreements at issue.

As was the case during the B&O Phase, however, the Schedules issued in the Osborn Phase reached the end of their contractual term without payment of the assigned fees. Thus, Plaintiff and the Osborn Firm also entered into a series of amendments to the Schedules that affirmed the Osborn Firm's obligation and extended the due date in exchange for the accrual of interest. As a result of these amendments and the accrual of interest through November 30, 2014, the Osborn Firm's total obligation under the Osborn Phase Assignment Agreement as of that date, inclusive of the transferred B&O obligations, was approximately $21,820,125. (*See* VC, ¶ 35). This obligation shall hereinafter be referred to as the "Osborn Phase Obligation."

On or about August 11, 2009, Osborn, on his own behalf, and on behalf of the Osborn Firm, entered into an Assumption Agreement with Plaintiff, pursuant to which Osborn and the Osborn Firm assumed the B&O Phase Obligation and agreed to perform all of B&O's duties and obligations under the B&O Phase Assignment Agreement. (*See* VC, ¶ 36; Ex. H).

## C.    The Subordination Agreements

Although the total obligation under the B&O Phase and the Osborn Phase Assignment Agreements had already grown to over $4.5 million by mid-2009, the Powell Defendants, the Bogert Defendants and Osborn still anticipated the need for substantial additional funding for the Litigations. (*See* VC, ¶ 38; Osborn Dec., ¶ 9). However, given the significance of the then-outstanding balance, as well as the continuing need to extend the payment deadlines and the absence of any imminent prospect of repayment, Plaintiff insisted on additional security for both the B&O Phase and Osborn Phase Obligations before advancing any more monies. Specifically, Plaintiff demanded that Defendants execute subordination agreements in which Defendants

8

individually and collectively agreed to subordinate to Plaintiff their respective interests in the Legal Fees that would eventually be due and owing to them in the Litigations. (*See* VC, ¶ 39).

There were two subordination agreements that Plaintiff presented, negotiated, and executed with Defendants: (1) a subordination agreement with the Osborn Firm and the Powell Firm, dated July 6, 2009 (the "Osborn/Powell Subordination Agreement") (*see* VC, ¶ 40; Ex. I); and (2) a subordination agreement with the Osborn Firm and Bogert, dated September 30, 2009 (the "Osborn/Bogert Subordination Agreement"). (*See* VC, ¶ 40; Ex. J). These agreements shall be collectively referred to as the "Subordination Agreements."

The operative terms of the Subordination Agreements are materially similar in that both Bogert and Powell "assign[ed], transfer[red] and convey[ed]" to Plaintiff their portion of the Legal Fees due and payable to them under the aforementioned fee agreements "as additional collateral" to secure the B&O Phase and the Osborn Phase Obligations. (VC, ¶ 41; Exs. I and J at ¶ 1.1.1). The Subordination Agreements also provide that Bogert and Powell "subordinate[d] in favor of [Plaintiff] any right, title, interest or lien" that they may have in their portion of the Legal Fees. (Exs. I and J at ¶ 1.1.2).

However, there were two distinct differences between the Osborn/Powell and the Osborn/Bogert Subordination Agreements with respect to the terms of subordination. First, the Osborn/Bogert Subordination Agreement assigns and subordinates without any limitation Bogert's right to all Legal Fees in satisfaction of both the B&O Phase Obligation and the Osborn Phase Obligation, whereas the Osborn/Powell Subordination Agreement limits the Powell Defendants' share of the B&O Phase Obligation to $1 million. (*Compare* Exs. I and J, ¶¶ 1.1.1 and 1.1.2). Specifically, Paragraphs 1.1.1 and 1.1.2 of the Osborn/Powell Subordination

Agreement respectively provide that Powell assigns and subordinates only the first $1 million in

Legal Fees in satisfaction of the B&O Phase Obligations. (*See id.*).

Yet, to be clear, there is no limitation with respect to the Powell Defendants' share of the

Osborn Phase Obligation. In fact, Paragraph 1.1.1 expressly provides that these Legal Fees shall

serve "as additional collateral securing Beatie and Osborn and Osborn Law's present and future

obligations" to Plaintiff. (VC, ¶ 44; Ex. J, ¶ 1.1.1) (emphasis added).

Second, Paragraph 1.1.1 of the Osborn/Powell Agreement grants to Powell the right to

terminate the Agreement upon thirty days' written notice on or after May 1, 2010.    The

Agreement makes clear, however, that Powell's right of termination applies "solely as to future

advances to Osborn Law." (VC, ¶ 45; Ex. J, ¶ 1.1.1) (emphasis added).

Aside from these limited differences, the Subordination Agreements were virtually

identical. They each contained the following provisions:

(a)     Joint Deposit Account: Defendants and Osborn shall open a joint deposit
        account (the "Joint Deposit Account") under their respective federal tax
        identification numbers. Upon the receipt of Legal Fees, Defendants and
        Osborn shall either (i) deposit the Legal Fees into the Joint Deposit
        Account or (ii) remit the Legal Fees directly to Plaintiff, until such time
        that the B&O Phase and Osborn Phase Obligations have been paid in full.
        (*See* VC, ¶ 46; Exs. I and J, ¶ 2).

(b)     Non-Removal of Funds: Defendants and/or Osborn shall not remove any
        monies from the Joint Deposit Account "for any reason until (i) the
        Litigation is settled or otherwise concluded, and (ii) [Defendants or
        Osborn] receive written notification from [Plaintiff] setting forth the
        aggregate dollar amount of the Obligations, at which time [Defendants and
        Osborn] shall remit such dollar amount in good funds to [Plaintiff] within
        forty-eight (48) hours of having received said notification." (VC, ¶ 47;
        Exs. I and J, ¶ 2).

(c)     Accounting: "Upon [Plaintiff's] request [Defendants and Osborn] shall
        each promptly provide [Plaintiff] with copies of all information,
        statements and reports pertaining to the Joint Deposit Account . . . ."
        (*Id.*).

10

(d)    Future Advances: Plaintiff may extend to B&O and/or the Osborn Firm additional funding or "financial accommodations" without any limitations whatsoever, and the Powell and Bogert Defendants shall have a continuing obligation to assign and subordinate their right to Legal Fees as security for and in satisfaction of the future obligations incurred by Osborn. (VC, ¶ 48; Exs. I and J, ¶ 1.6).

(e)    Specific Performance as Remedy for Breach: In the event of a breach by any Defendant or Osborn, (i) Plaintiff may, in addition to all other remedies available at law and equity, demand specific performance, (ii) Defendants and Osborn "waive any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance," and (iii) Defendants and Osborn shall be jointly and severally liable. (Exs. I and J, ¶ 5.1).

(f)    Governing Law/Jurisdiction: The Agreements are to be governed and construed in accordance with the laws of New Jersey and subject to the exclusive jurisdiction of the state or federal courts of New Jersey. (*See id.,* ¶ 9).

(g)    Counsel Fees: Counsel fees shall be awardable to the prevailing party in any action brought to enforce their provisions. (*See id., ¶ 8*).

After the execution of the Subordination Agreements, and given Defendants' continuing obligations with respect to any funding issued to Osborn thereafter, Plaintiff provided written notice to Defendants as to the advancement of funds by Plaintiff to Osborn and the corresponding assignment and subordination of Legal Fees by Defendants. (*See, e.g.,* VC, ¶ 52; Ex. K).

**D.    The Powell Defendants Terminate the Osborn/Powell Subordination Agreement and Dispute the Monies Owed to Plaintiff Thereunder.**

Following the execution of the Osborn/Powell Subordination Agreement, the Powell Defendants took specific actions to avoid and/or minimize their obligations thereunder. First, the Powell Defendants instructed Osborn to return approximately thirty bisphosphonate cases that they had originally referred to Osborn, but which Osborn had not yet filed, so that the Powell Defendants could refer them to another law firm involved in the Litigations. In so doing, the

11

Powell Defendants made clear to Osborn that their purpose in redirecting those cases, as well as any future cases, was to avoid subjecting them to the Osborn/Powell Subordination Agreement. (*See* VC, ¶ 53; Osborn Dec., ¶ 11).

Then, within a week of the date after which the Subordination Agreement could be terminated, the Powell Defendants not only exercised that right by letter dated May 7, 2010, but also took the unsupportable position that the letter was merely a formality because the Osborn/Powell Subordination Agreement capped his obligation in the aggregate at $2 million: "Technically this termination takes effect thirty days from today, but as Osborn Law has already received at least Two Million Dollars ($2,000,000) from RD Legal since January 1, 2009, the ceiling has already been reached and my terminating the agreement is just a mere formality." (VC, ¶ 54; Ex. L). In fact, by the close of the very next month, the Powell Defendants abandoned their position as to a $2 million aggregate cap, conceding instead that they could be liable to Plaintiff for well more than $3.2 million. (*See* VC, ¶ 55; Ex. M).

Even then, however, the Powell Defendants' position did not comport with the plain language of the Osborn/Powell Subordination Agreement. The Agreement does not provide for any aggregate limit. Nor does it in any way limit the Powell Defendants' share of the Osborn Phase Obligation. Rather, it merely limits their share of the B&O Phase Obligation to $1 million. At best, the true and full effect of the termination letter sent pursuant to Paragraph 1.1.1 of the Osborn/Powell Subordination Agreement is that it ensured that the Powell Defendants would not bear any responsibility or obligation with respect to "future advances" made by Plaintiff to the Osborn Defendants after the effective date of termination. (*See* VC, ¶¶ 56 and 57).

Thus, by the date of termination of the Osborn/Powell Subordination Agreement, the Powell Defendants' obligation to Plaintiff neared $6 million.    Specifically, the Powell Defendants' $1 million share of the B&O Phase Obligation, plus the $4,859,757 in obligations accruing as a result of assignments issued from the beginning of the Osborn Phase through the effective date of termination of the Osborn/Powell Subordination Agreement, brought the Powell Defendants' total obligation to $5,859,757.  (*See* VC, ¶ 58).

The Osborn/Bogert Subordination Agreement, on other hand, contained no limitations. As such, the Bogert Defendants and Osborn are jointly and severally liable for both the B&O Phase Obligations and the Osborn Phase Obligations, which total $26,689,011 as of November 30, 2014 and continue to accrue interest.  (*See* VC, ¶ 59).

In the wake of the termination letter, the Powell Defendants continued to dispute their obligations under the Osborn/Powell Subordination Agreement.  For example, in an e-mail dated July 2, 2010, Powell made clear that, if the parties could not come to an agreement as to his obligation, he would undertake efforts to ensure that Plaintiff was never repaid, stating:  "I expect that we'll have a firm total established by the end of next week, or I expect that I will begin the process of referring the cases to someone else, taking whatever smaller percentage we can get, and no one will likely ever see any money on any of these cases."  (VC, ¶ 60; Ex. N).

**E.    Defendants and Osborn Receive Legal Fees from the Litigations, but Defendants Fail to Satisfy Their Obligations to Establish a Joint Deposit Account, Provide an Accounting of the Fees Received, or Make Direct Payment to Plaintiff.**

As set forth in the Osborn Declaration, the Actonel Litigation has been settled, and Legal Fees have been disbursed in approximately seventy-five percent (75%) of the Actonel cases brought by the Defendants and Osborn with the remaining approximately twenty-five percent (25%) still outstanding.  Without informing Plaintiff, the Powell and Bogert Defendants agreed

13

to pay the Florida law firm of Aylstock, Witkin, Kreis & Overholtz ("Aylstock") thirty percent (30%) of the Legal Fees received from the Actonel cases to negotiate and effectuate the settlement. Because the Powell Defendants, the Bogert Defendants, and Osborn had involved the Aylstock law firm, the payment of Legal Fees received to date first went to Aylstock, then to the Powell Defendants, then to the Bogert Defendants, and then to Osborn. At each stage, Aylstock, the Powell Defendants, and the Bogert Defendants kept their share of the Legal Fees and forwarded the remaining balance.

The total fees received to date from the Actonel Litigation are approximately $593,200, with the Aylstock firm receiving approximately $197,535.60, the Powell Defendants receiving approximately $158,265.76, and the Bogert Defendants and Osborn together receiving approximately $237,398.64, of which the Bogert Defendants received approximately $59,349.66 and Osborn received $178,048.96. Osborn has since transferred to Plaintiff his entire share of the Legal Fees received from the Actonel Litigation as required by the Assignment Agreements. (*See* Osborn Dec., ¶ 12).

Prior to receiving any of the Legal Fees from the Actonel Litigation, Osborn spoke with Powell and Bogert regarding the Subordination Agreements. At that time, Powell advised Osborn that he did not believe that the Powell Defendants were required to turn over any of the Actonel fees. Osborn then later urged the Powell to establish the Joint Deposit Account as required by the Subordination Agreements. (*See id.*, ¶ 13).

The Powell Defendants, however, have steadfastly refused to do so. (*See id.*). Instead, through a letter from counsel dated October 17, 2014, the Powell Defendants made clear their intent to now challenge the validity of the Osborn/Powell Subordination Agreement in its entirety and to seek an injunction providing for a full accounting and the creation of an escrow

14

account in which future Legal Fees would be held pending the outcome of that litigation. (*See* VC, ¶ 67; Ex. O).

In the meantime, the release of the Legal Fees from the remaining Actonel cases is imminent, with the Powell Defendants expected to receive more than $50,000 and the Bogert Defendants expected to receive more than $20,000. Furthermore, the more substantial Legal Fees from the settlement of the Fosamax Litigation are expected to be distributed in the first quarter of 2015. (*See* Osborn Dec., ¶¶ 14 and 15).

## LEGAL ARGUMENT

### PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION COMPELLING DEFENDANTS TO SPECIFICALLY PERFORM THE TERMS OF THE SUBORDINATION AGREEMENTS.

### A.   Standard for Preliminary Injunction

In order to succeed on an application for a preliminary injunction, the moving party must demonstrate that: (1) there is a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the non-moving party; and (4) the public interest favors such relief. *See Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010).

Here, Plaintiff's likelihood of success on the merits is virtually certain. Not only have Defendants already committed material breaches of the Subordination Agreements by failing to establish a Joint Deposit Account, and failing to directly pay to Plaintiff or deposit into the Joint Deposit Account the substantial fees that they have received from the Actonel Litigation, but the Agreements themselves expressly provide for specific performance -- the core component of Plaintiff's injunctive relief -- in the event of a breach. Furthermore, compelling Defendants to abide by the plain terms of the Subordination Agreements not only serves the public's interest in

15

the protection of and enforcement of carefully negotiated and freely executed contracts, but it also is essential to preserving the benefit of Plaintiff's bargain and preventing the irreparable harm that will result if Defendants are permitted to withhold and dissipate substantial monies that properly belong to Plaintiff. Meanwhile, there is no conceivable harm that could result from Defendants fulfilling obligations to which they voluntarily agreed, and in exchange for which they have received, and will continue to receive, a substantial benefit in the form of more than $12 million in funding they used to recover the Legal Fees at issue.

## B.    There Is No Doubt that Plaintiff Is Likely to Succeed on the Merits

As set forth below, Plaintiff is likely to succeed on the merits of each of its affirmative claims:

(1)    Breach of Contract:  In New Jersey, a plaintiff seeking to establish a breach of contract must prove the existence of "a valid contract, performance, breach, and damages." *Red Roof Franchising, Inc. v. AA Hospitality Northshore, LLC*, 877 F. Supp. 2d 140, 149 (D.N.J. 2012).

The Subordination Agreements giving rise to this action were entered into freely and voluntarily and, at least with respect to the Powell Defendants, were the subject of active negotiations. Through these Agreements, Defendants obligated themselves, in no uncertain terms, to subordinate their rights to their share of the Legal Fees earned in the Litigations to Plaintiff's right to be repaid. They also committed to preserving and protecting Plaintiff's right of repayment by agreeing that all Legal Fees received by them would be either paid directly to Plaintiff or deposited into a Joint Deposit Account where they would remain unless and until all of the obligations to Plaintiff have been fully satisfied.    Yet, while Plaintiff fulfilled its obligations under the Subordination Agreements by advancing Defendants more than $12

16

million to finance their pursuit of the class action matters, Defendants have blatantly ignored their end of the bargain by failing to open a Joint Deposit Account, and keeping for themselves and sharing with others Legal Fees that rightfully belong to Plaintiff. Indeed, the damages that Plaintiff has already suffered are certain and significant, and they will only continue to escalate, and become less recoverable, absent the requested relief.

(2)    Conversion:    The elements of conversion are "(1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." *Corestar Int'l Pte, Ltd. v. LPB Communications*, 513 F. Supp. 2d 107, 127 (D.N.J. 2007). Stated otherwise, a clam for conversion will stand when "the owner has been deprived of his property by the act of another assuming an unauthorized dominion and control over it." *Bondi v. Citigroup, Inc.*, 423 N.J. Super. 377, 435 (App. Div. 2011) (citation and internal quotation marks omitted).

The Subordination Agreements could not be clearer about Plaintiff's right to immediate possession of the Legal Fees received by Defendants in the Litigations. Paragraph 1.1.1 of the Subordination Agreements state that the Powell and Bogert Defendants "assign, transfer and convey" to Plaintiff their portion of the Legal Fees due and payment under the B&O and Osborn Phase Fee Agreements "as additional collateral" to secure the B&O and Osborn Phase Obligations. Likewise, Paragraph 1.1.2 provides that the Powell and Bogert Defendants "subordinate in favor of [Plaintiff] any right, title, interest or lien" that they may have in their portion of the Legal Fees.

Yet, despite the clarity of these provisions and obligations approaching $6 million for the Powell Defendants and exceeding $26 million for the Bogert Defendants, they have not only sought fit to retain for themselves the more than $200,000 that they have collectively received

17

from the Actonel Litigation and unilaterally shareg with Aylstock an additional nearly $200,000 in Actonel fees, but the Powell Defendants have gone so far as to sabotage Plaintiff's efforts to be repaid and undermine Plaintiff's security for Defendants' obligations by redirecting cases to other counsel so as to avoid subjecting them to the Subordination Agreements. By doing so, Defendants have wrongfully exercised dominion and control over Plaintiff's property.

(3)    Unjust Enrichment[1]: "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). That is, there must be evidence "that the plaintiff expected remuneration from the defendant, or if the true facts were known to the plaintiff, he would have expected remuneration from the defendant, at the time that the benefit was conferred." *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109 (App. Div. 1966); *see also Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 196 (D.N.J. 2012).

From the very outset of the funding of the Litigations, Plaintiff undertook every reasonable measure to secure repayment. Through the B&O and Osborn Phase Assignment Agreements, as well as the B&O Loan Agreement, Plaintiff identified as collateral all legal fees received by Osborn, and his personal and business assets; Plaintiff filed UCC Statements perfecting its security interests; and Plaintiff made clear that any future creditors of Osborn would be required to subordinate their interests to its right to be repaid. Likewise, when Defendants and Osborn sought additional funding from Plaintiff in 2009, Plaintiff insisted that

---

[1] While Plaintiff maintains that the Subordination Agreements are valid and enforceable and also recognizes that a party cannot recover under theories of both breach of contract and unjust enrichment, *see Goldsmith v. Camden County Surrogate's Office*, 408 N.J. Super. 376, 382 (App. Div. 2009), the Powell Defendants have threatened to challenge their validity. As such, Plaintiff has alternatively pled unjust enrichment.

18

Defendants execute the Subordination Agreements which, again, "assign[ed], transfer[red] and convey[ed]" Defendants' rights to Legal Fees due and payable in the Litigations and mandated the establishment of the Joint Deposit Account.

It was based on these Subordination Agreements and the clear obligations set forth therein that Plaintiff advanced many millions of dollars in funding for the benefit of the Defendants and Osborn. To now permit Defendants to retain the benefits that they have derived (and will continue to derive) from the funds advanced by Plaintiff, particularly when Defendants collectively owe Plaintiff millions of dollars, would be truly unjust.

(4)     Breach of Implied Covenant of Good Faith & Fair Dealing: "A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001). The covenant prevents the parties to a contract from "interfer[ing] with the other's ability to enjoy the fruits of the contract." *CPS MedManagement, LLC v. Bergen Reg'l Med. Ctr, L.P.*, 940 F. Supp. 2d 141, 158 (D.N.J. 2013). While the covenant of good faith and fair dealing may not supersede a contract's express terms, the covenant may nevertheless be breached when a party performs within the terms of the contract. *See Wilson*, 168 N.J. at 244. The covenant's "guiding principle . . . emanates from the fundamental notion that a party to a contract may not unreasonably frustrate its purpose." *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 259 (App. Div. 2002); *see also Emerson Radio Corp. v. Orion Sales, Inc.*, 80 F. Supp. 2d 307, 314 (D.N.J. 2000), *rev'd on other grounds*, 253 F.3d 159 (3d Cir. 2001).

Here, Defendants steadfast failure to establish the Joint Deposit Account and wrongful retention of the Actonel Legal Fees alone constitutes bad faith. But the Powell Defendants' intent to deprive Plaintiff of the benefit of its bargain and frustrate the very purpose of the

Subordination Agreement becomes even more pronounced considering that they (i) syphoned away cases that were originally referred to Osborn and would have been subject to the Subordination Agreement, (ii) took the unsupportable position that the Osborn/Powell Subordination Agreement contains an aggregate limit of just $2 million, (iii) threatened to sabotage Plaintiff's right of repayment by referring future cases to other attorneys "so that no one will likely ever see any money on any of these cases"; and (iv) have now, post-funding and when the Legal Fees are being collected, announced they intend to challenge the validity of the Subordination Agreement in their entirety.

(5)     Breach of Fiduciary Duty:  In order to establish a claim for breach of fiduciary duty, a plaintiff must prove:  (a) the existence of a fiduciary relationship between the parties; (b) a breach of the duty resulting from that relationship; and (c) that the breach harmed the plaintiff. *See, e.g., McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 771 (3d Cir. 1990).   A fiduciary relationship exists when one person is entrusted to protect or manage the affairs or the rights of another. *See In re Niles*, 176 N.J. 282, 294 (2003).

Defendants' fiduciary duties to Plaintiff are established through the express terms of the Subordination Agreements.  Because the Legal Fees from which Plaintiff would be repaid would flow first to Defendants, the Subordination Agreements set forth a very strict protocol for the collection, deposit, and distribution of those Fees.  They not only provide for the establishment of the Joint Deposit Account, but they specifically direct that all Legal Fees shall be deposited into the Account; that Defendants shall not remove any monies until, among other things, they receive written notice from Plaintiff that all of the obligations under the agreements have been satisfied; and that Defendants shall provide Plaintiff with all information and statements for the

Joint Deposit Account. In direct contravention of these duties, however, Defendants have failed to open the Joint Deposit Account, and continue to withhold monies that belong to Plaintiff.

## C.    Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

To establish irreparable harm, a plaintiff must prove that it will face "potential harm which cannot be redressed by a legal or equitable remedy following trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). "The unsatisfiability of a money judgment can constitute irreparable injury." *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 206 (3d Cir. 1990) (affirming District Court's finding of irreparable harm because financial and legal difficulties plaguing defendant made satisfaction of future monetary judgment unlikely); *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 528-32 (D.N.J. 1999) (finding irreparable harm based on defendant's dissipation of assets that could make a money judgment for plaintiff's breach of contract, breach of fiduciary duty, and conversion unavailable). The fact that money is involved does not preclude a finding of irreparable injury. *United Steelworkers of Am., AFL-CIO v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979); *see also N.J. Coal. of Auto. Retailers v. DaimlerChrysler Motors Corp.*, 107 F. Supp. 2d 495, 500 (D.N.J. 1999). Under these circumstances, a preliminary injunction is a reasonable measure "to preserve the status quo pending final determination of the questions raised" even if the ultimate remedy sought is legal. *Deckert v. Independent Shares Corp.*, 311 U.S. 292, 290 (1940).

The actions undertaken to date by Defendants make clear the need for immediate injunctive relief.    Following the execution of the Subordination Agreements, the Powell Defendants undertook to minimize their obligations to Plaintiff by, among other things, redirecting some cases that were originally referred to Osborn, threatening to redirect the remainder of the cases referred to Osborn so as to ensure that "no one will likely ever see any

21

money on any of these cases," and blindly asserting that the Agreement provides for an aggregate limit of $2 million.

Moreover, Defendants' more recent actions have been geared to avoiding their obligations altogether. Not only have the Powell and Bogert Defendants collectively pocketed more than $200,000 in Legal Fees belonging to Plaintiff and failed to establish a Joint Deposit Account, but the Powell Defendants have also threatened through their counsel to challenge the enforceability of the Osborn/Powell Subordination Agreement in its entirety.

The need for injunctive relief to protect Plaintiff's right of repayment and to preserve its ability to recover the near $6 million owed by the Powell Defendants and the more than $26 million collectively owed by the Bogert Defendants and Osborn is clear and immediate. Indeed, the release of the Legal Fees for the remaining twenty-five percent (25%) of the Actonel cases is imminent, and the far more substantial Legal Fees from the Fosamax Litigation are expected to be released in the first quarter of 2015. The Fee Agreements expressly provide that all Legal Fees shall initially be placed within the sole control of the Powell Defendants. Thus, the only way to protect and preserve these significant assets that indisputably belong either in a Joint Deposit Account or with Plaintiff is through a preliminary injunction.

**D.    A Balancing of the Hardships Militates Heavily in Plaintiff's Favor**

A preliminary injunction is appropriate so long as "granting [such] relief will [not] result in even greater harm to the non-moving party." *Am. Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996).    Defendants here cannot establish any harm, let alone a countervailing harm, that would result from an injunction that, if granted, would merely require them to abide by the terms of the Subordination Agreements.

22

Pared to its essence, Plaintiff's application seeks nothing more than strict enforcement of the express terms of the parties' agreements. Indeed, the core of the injunctive relief requested (*i.e.*, specific performance) and each element thereof (*i.e.*, the immediate payment of the Legal Funds received from the Actonel Litigation, restraints against the transfer and/or dissipation of those Legal Fees, the creation of the Joint Deposit Account, the holding of the Legal Fees until the full satisfaction of all obligations to Plaintiff, and a full and detailed accounting of the Fees received and to be received) derive directly from the plain language of the Subordination Agreements.

Even more fundamentally, it is hard to imagine any harm that would result from an order providing for a full accounting and directing that all Legal Fees received, and to be received, by Defendants be held in a Joint Deposit Account pending the outcome of this matter. In fact, the October 17, 2014 letter from counsel for the Powell Defendants threatens to seek this same form of relief.

## E.    The Issuance of a Preliminary Injunction Would Serve the Public Interest.

There is no doubt that the issuance of a preliminary injunction fundamentally enforcing the terms of the Subordination Agreements will serve the public interest. As a general matter, the protection, preservation, and enforcement of a party's clear contractual rights lies at the heart of every business transaction. And the protection and preservation of the collateral pledged to secure the right to be repaid, in particular, is a crucial component of any economy.

In this instance, Plaintiff insisted upon precise measures to secure its right to repayment. Among other things, Plaintiff first executed with Osborn assignment and assumption agreements through which Plaintiff secured as collateral all of Osborn's business and personal assets, including Osborn's right to any and all legal fees due and owing to his firm. It then demanded

23

that the Powell and Bogert Defendants subordinate their share of the Legal Fees arising from the Litigations to Plaintiff's right to be repaid. It was only after Plaintiff put into place these safeguards that it provided substantial funds for the benefit of the Defendants. To now permit Defendants to ignore their obligations and retain, if not dissipate, the collateral that they pledged to Plaintiff would not only deprive Plaintiff of the benefit of its bargain, but it would also undermine the foundation of contract law and send a chilling message to others providing legal funding to attorneys under similar circumstances.

## CONCLUSION

In light of the foregoing, Plaintiff respectfully submits that the Court grant its application for a preliminary injunction: (a) restraining and enjoining Defendants from transferring, disbursing, secreting, dissipating, and/or otherwise disposing any and all Legal Fees that Defendants have received and/or will receive from the Litigations; (b) compelling Defendants to immediate and specifically perform their obligations under the Subordination Agreements and, more particularly, ordering that: (i) Defendants shall immediately establish the Joint Deposit Account for the purpose of depositing all Legal Fees received and/or to be received from the Litigations pending the disposition of this matter or, alternatively, an escrow account (the "Escrow Account") to be held in the name of, and monitored by, an independent fiscal agent, at Defendants' sole expense, for the purpose of depositing all Legal Fees received and/or to be received from the Litigations pending the disposition of this matter; (ii) Defendants shall immediately provide Plaintiff with a full accounting as to the status of the Litigations, and any and all Legal Fees received and expected to be received from the Litigations, or alternatively, an independent fiscal agent shall be appointed at Defendants' sole expense to investigate and provide a full accounting as to the status of the Litigations and any and all Legal Fees received

and to be received from the Litigations; and (iii) Defendants shall immediately pay to Plaintiff or deposit into the Joint Deposit Account or the Escrow Account all Legal Fees received from the Litigations, including those Legal Fees received from the Actonel Litigation; and (d) directing immediate and expedited discovery to ascertain all information relevant to the Litigations and the payments of Legal Fees to received and to be received from the Litigations.

Dated:        December 23, 2014
              Newark, New Jersey

                                    Respectfully submitted,

                                    By:  _____
                                           Eric T. Kanefsky, Esq.

                                    Calcagni & Kanefsky
                                    The New Jersey Office of Harris, O'Brien, St.
                                    Laurent & Chaudhry, LLP
                                    One Newark Center
                                    1085 Raymond Boulevard, 14th Floor
                                    Newark, New Jersey 07102